FILED ___ ENTERED
LODGED ___ RECEIVED

APR 0 2 2008   DB

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

FUNDS FROM WASHINGTON MUTUAL
BANK ACCOUNT #XXXXXX0063 HELD
IN THE NAME OF LARAMIE
PETROLEUM, INC. TOTALING $44,178.05,
MORE OR LESS, AND THE PROCEEDS
THEREFROM;

Defendant

No. C08-0515 RAJ

VERIFIED COMPLAINT FOR
FORFEITURE IN REM



08-CV-00515-CMP

COMES NOW the United States of America, by and through Jeffrey C. Sullivan,

United States Attorney for the Western District of Washington, and Richard E. Cohen,

Assistant United States Attorney for the District, and alleges:

I.

This is a Complaint for Forfeiture of funds from Washington Mutual Bank

Account #XXXXXX0063 held in the name of Laramie Petroleum, Inc. totaling

$44,178.05, more or less, and the proceeds therefrom (hereinafter "defendant funds"),

brought pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(A),

981(a)(1)(C), and 984, for violations of Title 18, United States Code, Section 1956, and

Title 18, United States Code, Sections 1341 and 1343.

VERIFIED COMPLAINT FOR FORFEITURE IN REM - 1
U.S. v. FUNDS FROM WASHINGTON MUTUAL BANK ACCOUNT #XXXX0063 HELD IN THE NAME OF
LARAMIE PETROLEUM, INC. TOTALING $44,178.05, (C08-            )

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

No fee, US Atty, warrant issued

II.

This Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345 and 1355.

III.

This Court has venue over this action pursuant to Title 28, United States Code, Section 1395.

IV.

The defendant funds, as described above, are now, and during the pendency of this action, will be in the jurisdiction of this Court.

V.

Between mid-2004 and the present, Robert Miracle ("Miracle") and others established a series of companies allegedly involved in the production and development of oil and gas in Indonesia. These companies were named MCube Petroleum, Inc. ("MCube"), Diski Limited Liability Company ("Diski LLC"); Basilam Limited Liability Company ("Basilam LLC"); and Halmahera-Remban Limited Liability company (Hal-Rem LLC). In addition, Miracle established a company named Laramie Petroleum , Inc. (Laramie), which purportedly provides oil field services in Malaysia and elsewhere in Southeast Asia. Miracle and his associates solicited at least two hundred individuals to invest or loan at least $54 million in or to these companies.

VI.

In soliciting investments in these entities Miracle and his associates made numerous representations. Among other representations, Miracle and his associates represented that earlier entities had been successful, and that funds being solicited from investors would be used only for the operations of the particular company in which the investment was being made.

VII.

Miracle and his associates made payments to investors in  Laramie, MCube, Diski LLC and Basilam LLC and represented that these payments were distributions of profits

VERIFIED COMPLAINT FOR FORFEITURE IN REM - 2
U.S. v. FUNDS FROM WASHINGTON MUTUAL BANK ACCOUNT #XXXX0063 HELD IN THE NAME OF
LARAMIE PETROLEUM, INC. TOTALING $44,178.05, (C08-          )

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   attributable to their investments in the respective entity.  Thus Miracle and his associates

2   paid Laramie and MCube investors dividends based on the number of shares owned; they

3   paid Diski and Basilam investors dividends based on the number of LLC units owned.

4   Investors in Hal-Rem LLC, the last investment vehicle created by Miracle, have however

5   received little or no return on their investments.

6                                         VIII.

7            In fact, contrary to Miracle's representations – Laramie, MCube, Diski LLC,

8   Basilam LLC, and Hal-Rem LLC have earned little, if any, money from oil services or oil

9   and gas production.  Instead, a substantial portion of the funds received from investors

10  has been used to make dividend payments to other investors, including investors in

11  earlier-established companies. For example, Hal-Rem LLC Investors' funds have been

12  used to pay dividends to investors in Diski LLC and Basilam LLC.  In additional Miracle

13  and his associates have diverted substantial amounts of investor funds for their own

14  personal benefit.

15                                        IX.

16           As a result, although Miracle and his associates have acquired contractual rights to

17  certain potential Indonesian oil fields and may even have received some revenue from oil

18  and/or gas production, the overwhelming majority of the payments made to investors have

19  derived from other investors' money.  Miracle and associates have been operating a type

20  of fraud known as a Ponzi scheme in which later investors' money is used to pay earlier

21  investors supposed profits on their investments.   In carrying out this scheme, numerous

22  violations of Title 18 United States Code, 1341 (mail fraud), 1343 (wire fraud) and 1956

23  (money laundering) were committed.

24                                        X.

25           A review of records for bank account XXXX0063 at Washington Mutual Bank

26  owned by Laramie Petroleum, Inc. reveals that funds exceeding $44,178.05 and traceable

27  to investor funds were transferred or deposited to the account during May, 2007, in

28  violation of Title 18 United States Code, sections 1956(a)(1)(A)I and 1956(a)(1)(B)I.

VERIFIED COMPLAINT FOR FORFEITURE IN REM - 3
U.S. v. FUNDS FROM WASHINGTON MUTUAL BANK ACCOUNT #XXXX0063 HELD IN THE NAME OF
LARAMIE PETROLEUM, INC. TOTALING $44,178.05, (C08-                    )

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

XI.

1

2   The defendant funds from Washington Mutual Bank Account #XXXXXX0063

3   held in the name of Laramie Petroleum, Inc. totaling $44,178.05, more or less, and the

4   proceeds therefrom, were seized on October 26, 2007, pursuant to a federal civil seizure

5   warrant. The defendant funds are subject to forfeiture pursuant to Title 18, United States

6   Code, Section 981(a), 981(a)(1)(C), and 984, in that they represent fungible assets found

7   in an account which previously contained funds of equal amount, constituting or derived

8   from proceeds of Laundering of Monetary Instruments, in violation of Title 18, United

9   States Code, Section 1956; and/or constitutes proceeds of Mail Fraud, in violation of Title

10  18, United States Code, Section 1341, and/or Wire Fraud, in violation of Title 18, United

11  States Code, Section 1343, and conspiracy to commit these crimes in violation of Title 18,

12  United States Code, Sections 371 and 1956(h), within on year of such offenses.

13

XII.

14  Additional facts supporting the forfeiture of the defendant currency are set forth in

15  the attached Seizure Warrant affidavit of Internal Revenue Service Special Agent Joseph

16  C. Lopez, Attachment "A" which is incorporated as if fully set forth herein.

17  \\\

18  \\\

19  \\\

20  \\\

21  \\\

22  \\\

23  \\\

24  \\\

25  \\\

26  \\\

27  \\\

28  \\\

VERIFIED COMPLAINT FOR FORFEITURE IN REM - 4
U.S. v. FUNDS FROM WASHINGTON MUTUAL BANK ACCOUNT #XXXX0063 HELD IN THE NAME OF
LARAMIE PETROLEUM, INC. TOTALING $44,178.05, (C08-            )

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    WHEREFORE, the United States requests that due process issue to enforce the

2  forfeiture of the defendant currency, that due notice be given to all interested persons to

3  appear and show cause why forfeiture of the defendant currency should not be decreed,

4  that the defendant currency be condemned as forfeited to the United States to be disposed

5  of according to law, and for such other and further relief as the Court may deem just and

6  proper.

7    DATED this ___2nd___ day of April, 2008.

8                                              Respectfully submitted,

9                                              JEFFREY C. SULLIVAN
                                               United States Attorney
10

11

12                                             RICHARD E. COHEN
                                               Assistant United States Attorney
13                                             WSBA #91005
                                               United States Attorney's Office
14                                             700 Stewart Street, Suite 5220
                                               Seattle, WA 98101-1271
15                                             Telephone:   (206) 553-2242
                                               Fax No.:     (206) 553-6934
16                                             E-mail: Richard.E.Cohen@usdoj.gov

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT FOR FORFEITURE IN REM - 5
U.S. v. FUNDS FROM WASHINGTON MUTUAL BANK ACCOUNT #XXXX0063 HELD IN THE NAME OF
LARAMIE PETROLEUM, INC. TOTALING $44,178.05, (C08-           )

1

## VERIFICATION OF COMPLAINT

2

3
STATE OF WASHINGTON )
) ss

COUNTY OF KING )

4

5   I, Joseph C. Lopez, declare under penalty of perjury that the following is true and

6   correct to the best of my knowledge:

7   I am a Special Agent with the Internal Revenue Service, Criminal Investigation

8   Division, and am assigned to this case. I have read the attached Complaint and know the

9   contents thereof; I have furnished the information contained in the Complaint based upon

10   my own investigation and that of other reliable official Government sources; and, based

11   on information and belief, the allegations contained in the Complaint are true.

12

13

14
JOSEPH C. LOPEZ
Special Agent

15
Internal Revenue Service
Criminal Investigation Division

16

17   SUBSCRIBED and SWORN to before me this _2nd_ day of April, 2008, by

Joseph C. Lopez.

18

19

20
Print: Jennifer M. Preciado
Notary Public in and for the

21
State of Washington, residing
at Seattle, WA

22
Expires: 7/4/11

23

24

25

26

27

28

VERIFIED COMPLAINT FOR FORFEITURE IN REM - 6
U.S. v. FUNDS FROM WASHINGTON MUTUAL BANK ACCOUNT #XXXX0063 HELD IN THE NAME OF
LARAMIE PETROLEUM, INC. TOTALING $44,178.05, (C08-            )

1

# EXHIBIT A

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VERIFIED COMPLAINT FOR FORFEITURE IN REM - 7
U.S. v. FUNDS FROM WASHINGTON MUTUAL BANK ACCOUNT #XXXX0063 HELD IN THE NAME OF
LARAMIE PETROLEUM, INC. TOTALING $44,178.05, (C08-          )

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# AFFIDAVIT

STATE OF WASHINGTON    )
                       )
COUNTY OF KING         )

I, Joseph C. Lopez, having been duly sworn, state:

## I.   INTRODUCTION

1.      I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service ("IRS-CID") and have been so employed since February 2005. I presently am assigned to IRS-CID's Seattle Field Office. My official duties include the investigation of possible criminal violations of the Internal Revenue laws, domestic-currency-reporting and money-laundering laws, and related statutes.

2.      I earned a Bachelor of Arts degree in accounting from the University of Montana in 1996. I attended the Criminal Investigator Training Program and the IRS Special Agent Basic Training Program at the Federal Law Enforcement Training Center, where I received detailed training in conducting financial investigations. The training included training regarding search and seizure, violations of the Internal Revenue laws, and IRS procedures and policies in criminal investigations. Before being hired by IRS-CID, I was a Revenue Agent for the IRS for approximately three years, performing civil examinations of small businesses and self-employed individuals. As a Revenue Agent, I received sixteen weeks of specialized training in personal, partnership, and corporate income tax.

3.      I currently am conducting a joint investigation with Special Agent Kathleen Moran of the Federal Bureau of Investigation ("FBI"). Agent Moran and I are investigating Robert L. Miracle for conspiracy, mail fraud, wire fraud, securities fraud, money laundering, failure to file tax returns, and evasion of tax. This affidavit is being submitted in support of an application for a search warrant to search four locations. Those locations are:

a.      The offices of Laramie Petroleum, Inc., located at Two Union

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1 | Square, 601 Union Street, Suite 4620, Seattle, Washington 98101;

2 |       b.      The offices of MCube Petroleum, Inc., located at Two Union Square,

3 | 601 Union Street, Suite 4610, Seattle, Washington 98101; and

4 |       c.      Miracle's residence, located at 9312 Northeast 32nd Street, Clyde

5 | Hill, Washington 98004.

6 |       d.      Peter T. Cole's residence, located at 2205 219th Lane Southeast,

7 | Sammamish, Washington 98075.

8 |       4.      The information contained in this Affidavit is based on my investigation, as

9 | well as information provided to me by Agent Moran, other law enforcement officers, and

10 | other witnesses. Because this Affidavit is submitted for the limited purpose of

11 | establishing probable cause in support of an application for a search warrant, the

12 | Affidavit does not set forth each and every fact that I have learned during the course of

13 | this investigation.

14 |                   II.   SUMMARY OF THE INVESTIGATION

15 |       5.      Between mid-2004 and the present, Miracle and others established a series

16 | of companies and solicited at least two hundred individuals to invest or loan at least $54

17 | million in or to those companies. The principal companies Miracle has established are, in

18 | the order in which they were established, Laramie Petroleum, Inc. ("Laramie"), MCube

19 | Petroleum, Inc. ("MCube"), Diski Limited Liability Company ("Diski LLC"); Basilam

20 | Limited Liability Company ("Basilam LLC"); and Halmahera-Rembang Limited Liability

21 | Company ("Hal-Rem LLC").

22 |       6.      The first of these companies, Laramie, purportedly provides oil-field

23 | services in Malaysia and elsewhere in Southeast Asia. The second, MCube, purportedly

24 | is an oil and gas development company involved in producing oil and gas in Indonesia

25 | and elsewhere in Southeast Asia. Diski LLC, Basilam LLC, and Hal-Rem LLC each

26 | purportedly is an oil and gas development company involved in developing and producing

27 | oil and/or gas from a specific field or fields in Indonesia. Thus, Diski LLC supposedly is

28 | involved in developing the Diski field; Basilam LLC supposedly is involved in

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   developing the Basilam field; and Hal-Rem LLC supposedly is involved in developing

2   the Halmahera and Rembang fields.

3        7.    In soliciting investments in these entities, Miracle and his associates made

4   numerous representations. Among other representations, Miracle and his associates

5   represented that earlier entities had been successful, and that funds being solicited from

6   investors would be used only for the particular investment at issue. For example, in

7   soliciting Hal-Rem LLC investors, Miracle and his associates represented that Diski LLC

8   and Basilam LLC had been successful and that Hal-Rem investors' money would be used

9   for the sole purpose of developing the Halmahera and Rembang fields.

10       8.    Miracle and his associates made payments to Laramie, MCube, Diski LLC,

11  and Basilam LLC investors and represented that these payments were distributions of

12  profits attributable to their investments in these entities. Thus, Miracle and his associates

13  paid Laramie and MCube investors dividends based on the number of shares owned; they

14  paid Diski and Basilam investors dividends based on the number of LLC units owned.

15  Investors in Hal-Rem LLC, the last investment vehicle created by Miracle, have,

16  however, received little or no return on their investments.

17       9.    In fact, interviews of witnesses and review of financial records suggests that

18  -- contrary to Miracle's representations -- Laramie, MCube, Diski LLC, Basilam LLC,

19  and Hal-Rem LLC have earned little, if any, money from oil services or oil and gas

20  production. Instead, a substantial portion of the funds received from investors has been

21  used to make dividend payments to investors, including investors in earlier-established

22  companies. For example, Hal-Rem LLC investors' funds have been used to pay dividends

23  to investors in Diski LLC and Basilam LLC. In addition, Miracle and his associates have

24  diverted substantial amounts of investor funds for their own personal benefit.

25       10.   As a result, I believe that, although Miracle and his associates may have

26  acquired contractual rights to certain oil fields and may even have received some revenue

27  from oil and/or gas production, the overwhelming majority of the payments made to

28  investors have derived from other investors' money. In other words, Miracle and his

1   associates have been operating a type of fraud known as a Ponzi scheme in which later

2   investors' money is used to pay earlier investors supposed profits on their investments.

3   As a result, I believe that Laramie, MCube, Diski LLC, Basilam LLC, and Hal-Rem LLC

4   are permeated with fraud.  In addition, it appears that, although Miracle personally has

5   received more than $2.5 million in income from Laramie, MCube, and investors, Miracle

6   has failed to report that income on personal income tax returns for the years 2004, 2005,

7   and 2006.

8          11.    I believe probable cause exists to believe that Miracle and others have

9   committed the following offenses and that evidence, fruits, and instrumentalities of such

10  offenses may be found at the properties to be searched:

11            a.    Conspiracy to Commit Mail Fraud and Wire Fraud, in violation of 18

12  U.S.C. § 371;

13            b.    Conspiracy to Commit Money Laundering, in violation of 18 U.S.C.

14  § Section 1956(h);

15            c.    Mail Fraud, in violation of 18 U.S.C. § 1341;

16            d    Wire Fraud, in violation of 18 U.S.C. § 1343;

17            e.    Money Laundering, in violation of 18 U.S.C. 1956 and 1957;

18            f.    Attempting to Evade or Defeat Income Taxes, in violation of 26

19  U.S.C. § 7201;

20            g.    Making and Subscribing False Income Tax Returns, in violation of

21  26 U.S.C. § 7206(l); and

22            h.    Failure to File a Return and Pay Taxes, in violation of 26 U.S.C. §

23  7203.

24            III.    THE INVESTIGATION

25  A.    Robert Miracle

26         12.    Miracle was born in 1960 and currently is 47 years old.  According to a

27  document titled MCube Petroleum, Inc., Company Overview that is dated 2007 (the

28  "MCube Company Overview"), Miracle studied petroleum engineering at the University

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  of Wyoming in the late 1970s and early 1980s. According to that same document,

2  Miracle "has over twenty years of experience in positions with Toyota and NASA as well

3  as serving as advisor to Mr. Frank Wells, the former President of Disney. Mr. Miracle

4  has owned and operated a number of companies that have enjoyed financial success,

5  including Laramie Petroleum, Inc. -- an oilfield services company specializing in

6  breakthrough advances in technology."

7      13.    Miracle also described his background during a deposition taken by an

8  attorney at the Washington Department of Financial Institutions ("DFI") in connection

9  with an investigation conducted by DFI of Laramie, MCube, Diski LLC, Basilam LLC,

10 and Hal-Rem LLC. (This investigation is described in Paragraphs 32-39 below.) During

11 that deposition, Miracle stated that he has a Bachelor of Science degree, and that he

12 attended graduate school in electrical engineering at the University of Wyoming for a-

13 year-and-a-half. Miracle said that, following school, he worked for Rockwell for two

14 years. Miracle said that, from 1986-90, he worked for Nippondenso, a Toyota subsidiary,

15 as an engineering liason. Miracle said that, from 1990-94, he worked as a personal

16 assistant to Frank Wells at Disney Corporation doing mergers and acquisitions. Miracle

17 said that, from 1995-99, he worked for Sourcenext, licensing the company's software in

18 Asia. And Miracle said that, beginning in 2001, he was a partner in a teak and mahogany

19 farm in the Dominican Republic, and that this was his immediate prior employment

20 before establishing Laramie and MCube. Unlike in his written biography, Miracle did not

21 claim that he ever had worked for NASA.

22      14.    Agent Moran and I have checked certain aspects of Miracle's background.

23 We found a website for Javier Farms, C. Por. A., that indicates that that company operates

24 tree farms in the Dominican Republic and was founded in 1999 by Stan Javier (the former

25 major league baseball player) and Miracle. We also found archived website copies of a

26 website for a company named Plasma Devices. That website was active from 2001 to

27 2005. According to the website, Plasma Devices was founded by Miracle and licensed

28 software, including software developed by Sourcenext, in Asia.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    15.    We also uncovered information that conflicts with representations in the

2  MCube Company Overview and in Miracle's deposition. Specifically, we contacted

3  Disney Worldwide Services, Inc., which informed us that it has no record that Miracle

4  ever was employed by the Disney Corporation. We also checked Miracle's criminal

5  history and learned that Miracle was convicted in 1994 in Oregon of Theft in the First

6  Degree, a felony, and sentenced to 18 months' probation and a $3,000 fine. According to

7  the police report in the case, Miracle was arrested for stealing text books from the offices

8  of two professors at Umpqua Community College in Winchester, Oregon. Included in the

9  police report is a written statement signed by Miracle in which Miracle wrote that his

10  most recent employment was with the Disney Corporation as a consultant. Also included,

11  however, was a report that stated that Miracle's first wife, Heloisa Miracle, from whom

12  he already was divorced, told investigating officers that Miracle was employed buying

13  textbooks from universities and reselling them.

14  B.    Offerings

15    16.    According to numerous MCube documents, including the MCube Company

16  Overview, Laramie, MCube, Diski LLC, Basilam LLC, and Hal-Rem LLC all have their

17  genesis in Miracle's time at the University of Wyoming. According to these documents,

18  while at the University of Wyoming, Miracle met a number of Malaysian students,

19  including Mukhtar Syed Kechik. According to the documents, after college, the

20  Malaysian students returned to Southeast Asia and rose in the oil industry. According to

21  the documents, Miracle and Kechik stayed in touch and, eventually, pooled their expertise

22  to co-found Laramie, and, subsequently, MCube.

23                                *Laramie*

24    17.    Laramie, a Washington corporation, was incorporated on August 16, 2004.

25  Laramie purportedly provides various oil-field services to oil companies in Malaysia and

26  elsewhere in Southeast Asia. According to Miracle's deposition, Laramie has 17

27  shareholders. Miracle also testified in his deposition that Miracle contributed $1.7

28  million out of a total of $2.4 million in funding that Laramie raised, and that he is

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1 President of the company. Since 2004, Laramie has issued a number of press releases,

2 including press releases announcing contracts and/or licenses to provide services to the

3 Malaysian oil industry.

4 *MCube*

5      18.    MCube, a Washington corporation, was incorporated on May 5, 2005.

6 According to the MCube Company Overview, MCube's business purpose is "to develop

7 and operate previously undeveloped or underperforming oil and gas wells in certain

8 foreign petroleum production blocks. At this time, it is primarily operating in Indonesia."

9 According to the MCube Company Overview, companies engaged in oil and gas

10 production in Indonesia are required to enter into either a Technical Assistance Contract

11 ("TAC") with Pertamina, an Indonesian governmental entity, or a Production Sharing

12 Contract ("PSC") with BP Migas, another Indonesian governmental entity. Under either

13 a TAC or a PSC, the companies obtain the right to drill for and produce oil and gas from a

14 particular area or "block;" they deliver that oil and gas to Pertamina or BP Migas; and

15 they subsequently receive payment from Pertamina or BP Migas for (1) reimburseable

16 capital and operating expenses and (2) a set portion of the revenues from the sale of the

17 oil and gas produced.

18      19.    According to the MCube Company Overview, MCube has direct or indirect

19 interests in five blocks in Indonesia. First, MCube has entered into a Joint Operating

20 Agreement (JOA) with an Indonesian company, PT Putra Batumandi Petroleum (PBP),

21 that holds the TAC for the Batumandi block, an oil field 38 kilometers northwest of

22 Medan. According to the terms of this JOA, which I have reviewed, MCube receives the

23 majority of the revenues generated by the joint venture between it and PBP. Second,

24 according to the MCube Company Overview, MCube has an ownership interest in three

25 subsidiaries -- Diski LLC, Basilam LLC, and Hal-Rem LLC -- that are involved in

26 developing the Diski, Basilam, and Halmahera and Rembang blocks, respectively.

27      20.    According to financial and corporate records, beginning as early as October

28 2005, MCube raised at least $935,000 from at least 18 investors by selling promissory

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   notes. The minimum investment required was $25,000. In return for their investment,

2   investors received promissory notes that promised to pay them interest at a rate of 12%

3   per year, as well as shares of MCube common stock. The MCube Company Overview

4   identifies Miracle and Kechik as founders of MCube. According to Miracle's deposition,

5   Miracle originally was the CEO of MCube. According to MCube documents, Kechik has

6   been the company's President since its inception.

*Diski LLC*

8   .       21.    Diski LLC, a Washington limited liability corporation, was incorporated on

9   December 8, 2005. According to the MCube Company Overview, MCube entered into a

10  JOA with an Indonesian company, PT Putra Kenkana Diski Petroleum (PKDP), that holds

11  the TAC for the Diski block, an energy-producing field located in the North Sumatra

12  Basin approximately 18 kilometers northwest of Medan. According to the terms of this

13  JOA, which I have reviewed, MCube receives the majority of the revenues generated by

14  the joint venture between it and PKDP, and those revenues go to Diski LLC.

15          22.    According to a Confidential Information Memorandum prepared in

16  connection with the Diski LLC offering, the offering was an offering of 64 units at a price

17  of $50,000 per unit, for a total of $3.2 million. According to this memorandum, the

18  offering was to run from December 9, 2005, until December 15, 2005, and proceeds from

19  the offering were to be used for three main purposes: to repay MCube approximately

20  $1.1 million to reimburse it for monies already spent in developing Diski; to retain $1.6

21  million for future development of oil-drilling sites within the Diski field; and $0.5 million

22  for general corporate purposes. According to the memorandum, following the offering,

23  MCube would own 66 units of Diski LLC and investors would own 64 units. The

24  memorandum projected that Diski would begin producing oil during the first quarter of

25  2006, and that the total return to investors would be $572,320 for each $50,000 unit.

*Basilam LLC*

27          23.    Basilam LLC, a Washington limited liability corporation, was incorporated

28  on March 8, 2006. According to the MCube Company Overview, MCube entered into a

1  JOA with an Indonesian company, PT Putra Kenkana Basilam Petroleum (PKBP), that

2  holds the TAC for the Basilam block, an energy-producing field located in the North

3  Sumatra Basin approximately 26 kilometers northwest of Medan.  According to the terms

4  of this JOA, which I have reviewed, MCube receives the majority of the revenues

5  generated by the joint venture between it and PKBP, and those revenues go to Basilam

6  LLC.

7           24.   According to a Confidential Information Memorandum prepared in

8  connection with the Basilam LLC offering, the offering was an offering of 80 units at a

9  price of $50,000 per unit, for a total of $4.0 million.  According to this memorandum, the

10  offering was to run from February 10, 2006, until February 28, 2006, and proceeds from

11  the offering were to be used solely to support the slightly more than $4 million worth of

12  capital expenditures and operating costs necessary during the first year of operation.

13  According to the memorandum, following the offering, MCube would own 81 units of

14  Basilam LLC and investors would own 80 units.  The memorandum projected that the

15  total return to investors for the first six years would be $324,456 for each $50,000 unit.

16                                    *Hal-Rem LLC*

17           25.   Hal-Rem LLC, a Washington limited liability corporation, was incorporated

18  on March 27, 2006.  According to the MCube Company Overview and contracts that I

19  have seen during my investigation, in March 2006, MCube purchased all of the shares of

20  Halmahera Petroleum, Ltd., and Oma International, Ltd., two British Virgin Islands

21  corporations that purportedly hold the PSCs for the Halmahera block, an energy-

22  producing field located on Halmahera Island, and the Rembang block, an energy-

23  producing field located 400 kilometers east of Jakarta.  According to the MCube

24  Company Overview, revenues from the production of oil and gas under these PSCs goes

25  to Hal-Rem LLC.

26           26.   According to a Confidential Information Memorandum prepared in

27  conjunction with the Hal-Rem LLC offering, the Hal-Rem LLC offering was an offering

28  of 600 units, out of a total of 3,000 Hal-Rem units, at a price of $100,000 per unit, for a

total of $60 million. According to this memorandum, the offering was to run from May 1, 2006, until December 31, 2006. According to Miracle's deposition, fewer than 200 units were actually sold. According to the memorandum, proceeds from the offering were to be used solely to support the slightly more than $60 million worth of capital expenditures and operating costs necessary during the first two years of operation. In addition to units sold directly, Hal-Rem LLC also sold convertible notes that entitled investors to receive 5% interest per month for nine months and to convert their notes into LLC units at the initial offering price at the end of the nine-month period.

27.     Unlike the Batamundi, Diski, and Basilam fields, which supposedly already had produced oil and/or gas, and which MCube merely was rehabilitating or bringing back into production, the Halmahera and Rembang blocks involved new exploration. As a result, MCube projected a longer time frame before Hal-Rem LLC would become profitable. The memorandum projected that the Halmahera and Rembang fields would not begin producing oil and/or gas, and generating profits, until either 2007 or 2008 (depending whether an 18-year projection began with the year 2005 or 2006, a point as to which the memorandum was internally inconsistent).

28.     Offering materials disseminated by MCube along with the memorandum state that the Halmahera and Rembang fields have quantifiable oil reserves of 2.2 billion barrels. One estimate I have seen suggests that the entire country of Indonesia's total oil reserves are approximately 9.6 billion barrels. Thus, the memorandum is estimating that the Halmahera and Rembang blocks -- which are two of more than 150 oil- and gas-producing blocks in Indonesia -- contain more than 20% of the entire country's reserves. The memorandum projected that the total return to Hal-Rem LLC investors over 18 years from extracting 25% of this oil, as well as gas would be $5,090,760 for each $100,000 unit.

29.     MCube actively promoted the prospects associated with the development of the Halmahera and Rembang blocks. Thus, the company issued press releases announcing its acquisition of the companies that supposedly hold the PSCs for the blocks.

1   This news was reported in Indonesian newspapers and on the web page of the United

2   States Embassy in Indonesia.  In addition, Kechik gave a presentation regarding MCube

3   and the Halmahera block at the Mining Metals/Oil & Gas Congress held in Dubai on

4   November 1 2006.  The presentation is available through the website

5   http://events.onlinebroadcasting.com/minellc/103106/index.php?mode=1&sel_date=2.

6   During this presentation, Kechik said that MCube was developing five blocks in

7   Indonesia, three of which were producing more than 5,000 barrels of oil per day, as well

8   as some gas.  Kechik and a co-presenter also gave detailed descriptions of the geology of

9   the Halmahera block.

10  C.    Subsequent Developments

11                          *Returns to Investors*

12         30.    Early investors initially received substantial returns on their investments.

13  Reports issued to investors in Diski LLC and Basilam LLC show that, during 2006, Diski

14  LLC investors received payments of $92,514 for each unit that they purchased (i.e., they

15  received their principal, and a substantial profit).  The reports show that Basilam LLC

16  investors received payments of $58,642 for each unit (i.e., they received their principal,

17  and a smaller profit).

18         31.    MCube represented to potential investors that these payments were being

19  made from oil production.  For example, a section titled "How it All Works" in a

20  document that was part of a binder used to promote Hal-Rem LLC stated that "[t]he first

21  *two fields [acquired by MCube] are currently generating approximately $2.5 million per*

22  *month for MCube and its investors.*"  Payments of dividends to Diski LLC and Basilam

23  LLC unit holders ceased in approximately February 2007.  Persons who invested in Hal-

24  Rem LLC never received any dividends.

25                          *DFI Investigation*

26         32.    On May 24, 2006, DFI served MCube a subpoena and a warning letter

27  indicating that DFI believed that MCube was violating Washington's Securities Act.

28  Notwithstanding this warning letter, Miracle and MCube continued to offer and sell Hal-

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

Rem LLC units. For example, Miracle told one investor that he was aware of DFI's

investigation but was still offering and selling Hal-Rem units. On October 12, 2006, DFI

staff met with Miracle and others and again advised Miracle that MCube could be in

violation of Washington's Securities Act. On December 12, 2006, DFI entered a

Statement of Charges and Notice of Intent to Cease and Desist against Miracle and his

various entities. On December 15, 2006, DFI served this document on Miracle and

MCube. Notwithstanding this action, Miracle and MCube continued to solicit investors

to loan Miracle or MCube money in return for interest payments of 1-2% per month.

33. MCube also misrepresented the status of DFI's investigation. For example,

on December 18, 2006, MCube posted a statement on its website that stated:

> REALLY BIG NEWS: The State of Washington, Department
> of Financial Institutions has finished their investigation begun
> in May. They have determined that the company committed
> procedural errors in the sale and/or original gifting of shares.
> The company has received a small fine and directions to make
> sure to follow all state and federal securities laws in any
> future offerings. This is a very good result for the company –
> as good as could be expected considering the fact that
> document and regulatory filings were done incorrectly when
> the company was younger.

This statement was false in that the DFI investigation remained ongoing, and that DFI had

not determined what penalties to impose.

34. During the course of DFI's investigation, MCube produced several boxes of

records to DFI. Among those records were what purported to be several months of bank

statements for an account belonging to PT MCube Indonesia, MCube's Indonesian

subsidiary, at Bank Niaga in Indonesia. Included on those statements were deposits of

$6,780,052 from Pertamina (presumably, revenue from the production of oil or gas), and

payments of $3,325,000 to Elnusa Drilling (presumably, a drilling expense). As noted

below in Paragraph 61, I have since obtained a separate set of copies of these bank

statements that do not include these amounts. As a result, I believe that the statements

were altered and these items fraudulently incorporated into the statements by Miracle or

one of his associates in an attempt falsely to suggest that MCube was generating revenue

from oil production activities in Indonesia that the company was not actually generating.

35.     On February 21, 2007, DFI conducted a deposition of Miracle.  During that deposition, Miracle stated that Laramie's offices are located at 601 Union Street in Seattle and that Laramie keeps all of its books and records there.  Miracle said that he was paid a salary of $320,000 per year by Laramie.  Miracle said that Laramie did not need any funding at this point and had not for almost three years.  Miracle said that no investor funds invested into other entities were deposited into Laramie's bank account.  Miracle said that every Laramie investor other than himself had been repaid and that the funds for these payments derived from dividends that Laramie, which had an ownership interest in MCube, received from MCube.

36.     Miracle also discussed MCube.  Miracle said that MCube keeps books and records at its office in Seattle, as well as in Jakarta.  Miracle said that Diski LLC and Basilam LLC financial records are kept in Seattle.  Miracle said that he was paid a salary of $360,000 a year by MCube, in addition to his salary from Laramie (for a total salary of $680,000 per year).  Miracle said that MCube was generating revenues sufficient to pay its bills and that it was not using investor funds for day-to-day activities.  Miracle said that MCube was drilling and producing oil and/or gas from the Batumandi, Diski, and Basilam blocks.  Miracle said that the oil production from the Batumandi, Diski, and Basilam blocks was the principal source of MCube's revenue.  Miracle said that all MCube investors had been repaid from this revenue.

37.     Miracle said that Diski LLC has been in the black since the first month it came on line, had been profitable for quite some time, and needed no funding to run operations.  Miracle said that Diski LLC unit holders were paid back from Diski revenues.  Miracle said that Basilam LLC also was self-sufficient financially, and became so in its first month.  Miracle estimated that Basilam LLC made $7.2 million in 2006.  Miracle said that Diski LLC and Basilam LLC unit holders were paid from revenue paid by Pertamina to MCube.  Miracle estimated that Hal-Rem LLC raised $21 million from investors, not counting convertible debt.

38.     Based upon interviews I have conducted, subsequent communications to

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   investors, which are described at Paragraph 45, and the financial analysis below at

2   Paragraphs 54-65, I believe that none of these companies has actually generated any

3   substantial revenues from oil or gas production.  As a result, I believe that Miracle's

4   statements during his deposition concerning the companies' performance and the source

5   of money used to pay dividends to shareholders were false.

6       39.    On April 10, 2007, DFI entered a final order to cease and desist in which it

7   found that Miracle, Laramie, MCube, Diski LLC, Basilam LLC, and Hal-Rem LLC had

8   sold unregistered securities and had made misstatements of material fact.  DFI imposed a

9   total of $92,000 in fines and $75,505 in costs, and ordered Miracle and these entities to

10  cease and desist from further violations of Washington's Securities Act.

11  *Developments in 2007*

12      40.    As noted in Paragraph 31, in approximately February 2007, Diski LLC and

13  Basilam LLC ceased making dividend payments to unit holders.  In late February or early

14  March 2007, Miracle resigned as CEO of MCube.  Miracle was replaced by Peter Cole,

15  who had been MCube's Treasurer and Controller since at least May 2006.  On May 9,

16  2007, MCube sent a letter to its investors informing them that, following the death of

17  Cole's wife, Cole too had resigned from the company.  The letter stated that Miracle had

18  assumed the role of President of MCube Energy, Ltd., which "manages all of our

19  overseas production assets and exploration activities." It also informed investors that

20  Barry Marshall had become Chairman of the Board of Directors and CEO of MCube.

21      41.    The May 9, 2007, letter to investors also explained the cessation of dividend

22  payments by stating that such payments depended both on production and on how diligent

23  the Indonesian government was in making payments.  According to the letter, the

24  Indonesian government had fallen behind on payments and MCube and its subsidiaries

25  now were owed a $20 million "receivable."

26      42.    On June 1, 2007, Marshall sent letters to Diski LLC and Basilam LLC

27  investors.  Those letters included financial statements for 2006.  The Diski LLC statement

28  showed that Diski had $7.1 million "cash received on the sale of petroleum" in 2006, and

1   that Diski LLC had earned a profit of $5.5 million, that is $42,161 per unit, and made

2   distributions of $92,514 per unit in 2006. The Basilam LLC statement showed that

3   Basilam LLC had $6.1 million "cash received on the sale of petroleum" in 2006, and that

4   Basilam LLC had earned a profit of $6.6 million, that is $41,412 per unit, and made

5   distributions of $58,642 per unit in 2006.

6         43.    On June 22, 2007, Marshall sent letters to investors in Diski LLC and

7   Basilam LLC introducing himself as the new CEO of MCube, and introducing Jim

8   Downing and Tom VanBockern as former business associates who were going to be

9   assisting Marshall in running MCube. Marshall also included minutes of investor

10  meetings held on June 11, 2007, as well as financial reports for the first quarter of 2007

11  for Diski LLC and Basilam LLC. Those letters stated that Diski LLC production had

12  been cut back and that first quarter income was only $116,000, that is $891 unit. They

13  also stated that Basilam production had been cut back and that Basilam LLC had a first

14  quarter loss of $411,000, that is $2,567 per unit.

15        44.    In July 2007, MCube disseminated the MCube Company Overview.

16  This contained profit and loss statements for Diski LLC and Basilam LLC that reflected

17  the same profits shown in the statements distributed on June 1, 2007. In addition, it

18  contained a balance sheet for Diski LLC that showed $4.3 million of accounts receivable,

19  and a balance sheet for Basilam LLC that showed $10.2 million of accounts receivable,

20  both as of December 31, 2006.

21        45.    On August 31, 2007, Barry Marshall sent letters to investors in MCube,

22  Diski LLC, and Basilam LLC. Notwithstanding the fact that Miracle and MCube

23  previously had reported receiving millions of dollars in revenues from Batumandi, Diski,

24  and Basilam, and had paid out millions of dollars of dividends, each letter contained the

25  following paragraph:

26              When the original deal was done for Batumandi, Diski,
             and Basilam what was not recognized that there was a debt
             that the original TAC (technical assistance contract) holder
27           owed to Pertamina. It turns out that the debt was sizeable and
             not discovered until well into the JOA (joint operating
28           agreement). The company was not paid for production early

on in the life of the JOA and numerous inquires and meetings didn't solve the problem. Eventually, the company came to know of the debt and began to recognize that it wouldn't get paid until the debt that the TAC holder had was paid. This situation existed up until this summer. To put it another way, MCube never was paid anything for its efforts in the three fields. We have been informed that the debt of the TAC holder has been satisfied and under an arrangement with the TAC holder and Pertamina, MCube and related LLC unit holders will receive 100% of the TAC share of income until the funds that we should received have been paid back. That amount, we are told by our Indonesian office, is approximately $22mm USD for all three fields. We have requested the TAC holder sign a promissory note to that effect as well. This is a classic good news bad news situation that is made all the more complex by the following events: 1) Unit holders in both Diski and Basilam were paid for production even though revenues were not received and it appears likely that in both cases were overpaid, 2) there has been no meaningful production in any of the three fields since at least the first quarter of 2007 and 3) we do not now anticipate any production until the end of the year in the three fields. (emphasis added)

46.     On September 24, 2007, Miracle sent investors an update stating that Marshall, Downing and VanBockern had resigned, that Miracle had resumed the position of Chairman of the Board, and that Kechik remained President of MCube.

D.     Witness Interviews

47.     During the course of my investigation, I have interviewed a confidential source ("the CS"), who began as an investor and who subsequently was employed by MCube. The CS was introduced to Miracle in 2005 and purchased 30 shares of MCube for $30,000. After paying for the shares, the CS received them by mail. Miracle subsequently solicited the CS to invest in Diski LLC. Miracle told the CS that Diski LLC investors would be paid out of funds generated from oil revenue, that a $50,000 investment would return $500,000 over three years, and that the full principal would be returned in three months.

48.     The CS invested in Diski LLC and, subsequently, also invested in Basilam LLC. The CS stated that he/she received dividend payments from Diski LLC and from Basilam LLC. The CS then purchased a $100,000 convertible note for Hal-Rem LLC. The CS said that Miracle told him/her that the 5% per month interest payments on the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    Hal-Rem LLC notes came from revenues generated on the oil production from the

2    Batumandi and Diski fields. The CS said that Kechik told the CS that Batumandi and

3    Diski were producing 5,000 barrels of oil a day.

4        49.     The CS said that, at some point, Miracle told the CS that Miracle wanted to

5    raise $1.2 million every month. Miracle said that the money was needed for oil

6    exploration. The CS said that he/she became concerned when he/she realized that $1.2

7    million was the amount owed monthly to the investors/note holders in Diski LLC,

8    Basilam LLC, and Hal-Rem LLC. The CS said that, in approximately February 2007,

9    he/she told Miracle he/she was concerned because it appeared that investors were being

10   paid from new investor funds, rather than from revenue generated by oil production. The

11   CS said that Miracle told the CS that MCube would inform all the investors regarding the

12   matter at some date in the future.

13       50.     The CS said that Miracle used Laramie's corporate American Express card

14   to fund his lifestyle. The CS said that the bill for this credit card was paid using money

15   from MCube. The CS said that, in early 2007, after Miracle resigned from MCube,

16   Miracle took all of MCube's documents and locked them in Laramie's office space. The

17   CS said that Laramie employees subsequently accessed MCube spreadsheets and changed

18   information in the spreadsheets.

19       51.     I also have participated in interviews of a person who was employed in a

20   significant position by Laramie Petroleum, who owned shares in MCube, and who

21   subsequently invested in Hal-Rem LLC (the Laramie Employee). The Laramie Employee

22   told me that – contrary to the claim in the MCube Company Overview that Laramie had

23   been financially successful -- as of August 2007, Laramie never had generated any

24   revenue from the sale of oil services. The Laramie Employee said that, in mid-2006,

25   Miracle told the Laramie Employee that MCube was funding Laramie.

26       52.     The Laramie Employee said that, in 2006, Miracle told the Laramie

27   Employee that MCube was receiving money every week from Batumandi, Diski, and

28   Basilam fields. The Laramie Employee said that, in October 2006, he received a dividend

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  on his MCube shares and that Miracle told him that the dividend was from oil revenue

2  and that revenue was coming in every month.  The Laramie Employee said that, in early

3  2007, however, Cole told the Laramie Employee there were no oil revenues.  The

4  Laramie Employee said that he told Cole that it was wrong to pay dividends from investor

5  funds and that Cole responded that MCube was trying to straighten things out.

6       53.    At my request, the Laramie Employee provided sketches of Laramie's

7  offices at 601 Union Street, Suite 4620, and MCube's offices at 601 Union Street, Suite

8  4610.  The Laramie Employee identified the location of numerous computers in both

9  Laramie's and MCube's offices.  The Laramie Employee also has told us that Miracle has

10  a laptop computer, and that Miracle takes both his laptop and documents with him when

11  he leaves the office in the evening.  Finally, the Laramie Employee told us that the head

12  of security at MCube had told the Laramie Employee that Miracle had asked him to bug

13  MCube's offices, and that the head of security had done so.

14  E.    Financial Analysis

15       54.    I have reviewed and analyzed records for bank accounts in the United States

16  belonging to Laramie, MCube, Diski LLC, Basilam LLC, Hal-Rem LLC, and Miracle for

17  the period from 2004 until the end of January 2007.  In addition, I recently have received,

18  and am in the process of analyzing records for bank accounts belonging to these entities

19  for the period from February 2007 to the present.

20       55.    In overview, my analysis suggests that approximately $54 million was

21  invested in or loaned to Miracle's companies through January 2007.  Of this amount,

22  approximately $5 million was sent by wire to Malaysia and Indonesia.  Of the remaining

23  $49 million, approximately $30 million was paid to investors and lenders, $10 million

24  was paid to the entity from which MCube acquired Halmahera Petroleum, Ltd., and Orna

25  International, Ltd. (the companies that purportedly own the Halmahera and Rembang

26  PSCs), approximately $6.5 million was used to pay expenditures for Laramie and MCube,

27  and approximately $2.5 million was paid to Miracle or for Miracle's benefit.  My analysis

28  has revealed no incoming wires from Malaysia and only two incoming wires from

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   Indonesia, dated June 26, 2007, for approximately $1 million.

2      56.     More specifically, the following investor deposits, totaling approximately

3   $54,784,868, were made into the accounts in the names of Laramie, MCube, Diski LLC,

4   Basilam LLC, Hal-Rem LLC, and Miracle. Some investors sent cashiers checks by

5   United States mail that were deposited into these accounts. Other investors' deposits

6   were made through the use of wire transfers. In many instances, these transfers were

7   made from out-of-state financial institutions.

8      a.     $3,629,074 was deposited into Laramie's Columbia Bank account

9   ending in 7523 from individuals I believe to be investors between January 2005 and

10   January 2007.

11      b.     $13,932,496 was deposited into MCube's Columbia Bank account

12   ending in 8211 from individuals I believe to be investors between August 2005 and

13   January 2007.

14      c.     $13,613,300 was deposited into Hal-Rem's Columbia Bank account

15   ending in 5922 from individuals I believe to be investors between May 2006 and January

16   2007.

17      d.     $12,586,936 was deposited into Hal-Rem's Bank of America

18   account ending in 5336 from individuals I believe to be investors between April 2006 and

19   January 2007.

20      e.     $3,070,934 was deposited into Hal-Rem's Bank of America account

21   ending in 7709 from individuals I believe to be investors between August 2006 and

22   November 2006.

23      f.     $2,850,000 was deposited into Basilam LLC's Columbia Bank

24   account ending in 5252 from individuals I believe to be investors between March 2006

25   and May 2006.

26      g.     $2,637,055 was deposited into Diski LLC's Columbia Bank account

27   ending in 9439 from individuals I believe to be investors between December 2005 and

28   March 2006.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1     h. $634,978 was deposited into MCube's Columbia Bank account

2 ending in 3712 from individuals I believe to be investors between July 2006 and August

3 2006.

4     i. $807,500 was deposited into Miracle's Columbia Bank account

5 ending in 8221 from individuals I believe to be investors between March 2005 and

6 February 2007.

7     j. $676,096 was deposited into Miracle's Columbia Bank account

8 ending in 4662 from individuals I believe to be investors between September 2004 and

9 February 2005.

10     l. $304,500 was deposited into Miracle's Columbia Bank account

11 ending in 8213 from individuals I believed to be investors between March 2005 and

12 February 2007.

13     m. $42,000 was deposited into Miracle's Columbia Bank account

14 ending in 4399 from individuals I believe to be investors on September 30, 2004.

15   57. The following payments, totaling approximately $30,852,304, were made to

16 persons I believe to be investors out of the accounts in the names of Laramie, MCube,

17 Diski LLC, Basilam LLC, Hal-Rem LLC, and Miracle.  Dividend payments commonly

18 were sent to investors by United States mail.

19     a. $1,715,024 was paid out of Laramie's Columbia Bank account

20 ending in 7523 to individuals I believe to be investors between February 2005 and

21 January 2007.

22     b. $15,411,697 was paid out of MCube's Columbia Bank account

23 ending in 8211 to individuals I beleive to be investors between August 2005 and January

24 2007.

25     c. $3,350,679 was paid out of Hal-Rem's Columbia Bank account

26 ending in 5922 to individuals I believe to be investors between June 2006 and September

27 2006.

28     d. $103,546 was paid out of Hal-Rem's Bank of America account

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  ending in 5336 to an individual I believe to be an investor on July 31, 2006.

2         e.    $4,514,227 was paid out of Basilam LLC's Columbia Bank account

3  ending in 5252 to individuals I believe to be investors between May 2006 and January

4  2007.

5         f.    $5,346,889 was paid out of Diski LLC's Columbia Bank account

6  ending in 9439 to individuals I believe to be investors between March 2006 and January

7  2007.

8         g.    $200,000 was paid out of Miracle's Columbia Bank account ending

9  in 8221 to individuals I believe to be investors between September 2004 and October

10  2006.

11         h.    $199,883 was paid out of Miracle's Columbia Bank account ending

12  in 4662 to individuals I believe to be investors between September 2004 and August

13  February 2005.

14         i.    $10,358 was paid out of Miracle's  Columbia Bank account ending

15  in 4399 to an individual I believe to be an investor on March 3, 2004.

16      58.    The approximately $23,932,564 by which investor deposits exceeded

17  investor payments was disbursed out of the accounts in the name of Laramie, MCube,

18  Diski LLC, Basilam LLC, Hal-Rem LLC, and Miracle as follows:

19         a.    approximately $5,987,704 was disbursed from Laramie's Columbia

20  Bank account ending in 7523:

21         (1)    A total of approximately $1,678,130 to credit card payments

22  between February 2005 and January 2007, approximately $968,852 of which were

23  payments to the Laramie American Express card.  A total of approximately $410,105 of

24  the credit card payments went to the following items purchased by Miracle on this card:

25      •    Seattle Supersonics Basketball    $116,350

26      •    Airfare (Miracle family members)    $103,131

27      •    Cruise    $ 68,097

28      •    Whistler, Canada (hotel/etc.)    $ 36,587

| | | |
|---|---|---|
| • | Clothing | $ 27,864 |
| • | Goods | $ 26,416 |
| • | Car/Boat | $ 8,210 |
| • | Jewelry | $ 5,737 |
| • | Other sports tickets | $ 5,212 |
| • | London, England (hotel/etc.) | $ 7,741 |
| • | Ballet tickets | $ 2,564 |
| • | Venice, Italy (hotel/etc.) | $ 2,194 |
| | Total | $410,105 |

(2)   A total of approximately $1,207,449 to Payroll/Director Fees/Travel Reimbursements between January 2005 and January 2007.

(3)   A total of approximately $1,098,119 to Office Lease/Benefits/Miscellaneous Expenditures between January 2005 and January 2007.

(4)   A total of approximately $796,168 to Miracle between January 2005 and January 2007.

(5)   A total of approximately $411,000 to Larpetro (M) SDN BHD RHB's Bank Bernad account ending in 8499 between January 2005 and January 2007. (Larpetro is Laramie's Malaysian subsidiary.)

(6)   A total of approximately $382,869 to the Internal Revenue Service between January 2005 and October 2006.

(7)   A total of approximately $100,248 to Yuko Kobayashi between January 2005 and September 2005. (Kobayashi is Miracle's second wife.)

(8)   A total of approximately $99,541 in Cash Withdrawals between May 2005 and September 2005.

(9)   A total of approximately $45,000 to Kechik's Indonesia Bumiputra Commerce account ending in 4071 between May 2005 and September 2005.

(10)   A total of approximately $35,150 to The Moyer Foundation between May 2005 and January 2007.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1      (11)    A total of approximately $30,375 to Robert Half on October
2  31, 2006.

3      (12)    A total of approximately $28,000 to Environmental Hazards
4  Control between February 2005 and March 2005.

5      (13)    A total of approximately $27,532 to Perry Earth Imaging
6  between April 2005 and June 2005.

7      (14)    A total of approximately $22,965 for Sporting Event Tickets
8  (Mariners/Supersonics/Thunderbirds) between March 2005 and September 2006.

9      (15)    A total of approximately $13,128 to Peters & Company Inc.,
10  PS, between May 2005 and January 2007.

11      (16)    A total of approximately $10,000 to a PT MCube Indonesia
12  account at an unknown bank ending in 2722 on December 29, 2006.

13      (17)    A total of approximately $2,030 to ATM Withdrawals
14  between May 2005 and July 2005.

15      b.    approximately $16,174,062 was disbursed from MCube's Columbia
16  Bank account ending in 8211:

17      (1)    A total of approximately $10,200,000 to Razief Nur Usman
18  between March 2006 and April 2006.  (Usman is the person who sold MCube Halmahera
19  Petroleum, Ltd., and Orna International, Ltd., the companies that purportedly own the
20  Halmahera and Rembang PSCs).

21      (2)    A total of approximately $1,700,000 to PT Elnusa Drilling
22  Services Indonesia between May 2006 and December 2006.

23      (3)    A total of approximately $1,220,000 to PT MCube Petroleum
24  Indonesia's Bank of America account ending in 6025 between May 2006 and January
25  2007.

26      (4)    A total of approximately $890,427 to Miracle between
27  October 2005 and January 2007.

28      (5)    A total of approximately $800,000 to PT MCube Petroleum

1    Indonesia's Bank Niaga account ending in 1000 between October 2005 and July 2006.

2            (6)     A total of approximately $350,070 to an unknown Indonesian

3    account during October 2006.

4            (7)     A total of approximately $272,455 to unknown checks written

5    between August 2005 and January 2007.

6            (8)     A total of approximately $215,090 to the Internal Revenue

7    Service between January 2006 and January 2007.

8            (9)     A total of approximately $129,277 to Payroll/Director Fees

9    between August 2005 and January 2007.

10           (10)     A total of approximately $103,000 to Larpetro (M) SDN

11    BHD's HSBC Bank of Malaysia account ending in 0725 during September 2005.

12           (11)     A total of approximately $93,021 to Credit Cards between

13    August 2005 and January 2007.

14           (12)     A total of approximately $80,913 to Office Lease between

15    January 2006 and January 2007.

16           (13)     A total of approximately $69,333 to Miracle Energy LLC

17    between July 2006 and January 2007.

18           (14)     A total of approximately $14,555 on Miscellaneous Items

19    between August 2005 and January 2007.

20           (15)     A total of approximately $11,919 to Furniture and Fixtures

21    between March 2006 and January 2007.

22           (16)     A total of approximately $10,000 to Yuko Kobayashi on

23    September 8, 2006.

24           (17)     A total of approximately $9,000 to Marquis Jet Partners on

25    July 27, 2006.

26           (18)     A total of approximately $5,000 to Peters & Company Inc.,

27    PS, on January 1, 2007.

28         c.      approximately $509,934 was disbursed from MCube's Columbia

1  Bank account ending in 5922:

2          (1)   A total of approximately $358,047 to PT Elnusa Drilling

3  Services Indonesia on August 24, 2006.

4          (2)   A total of approximately $86,972 to Marquis Jet Partners on

5  July 26, 2006.

6          (3)   A total of approximately $50,000 to an Unknown Account in

7  Indonesia on January 31, 2007.

8          (4)   A total of approximately $10,000 to Miracle on January 24,

9  2007.

10          (5)   A total of approximately $3,940 to Wyoming Investments on

11  June 9, 2006.  (Wyoming Investments is a company I know to be associated with

12  Miracle.)

13          (6)   A total of approximately $975 to wire fees between May 2006

14  and January 2007.

15          d.    approximately $155,707 was disbursed from Diski LLC's Columbia

16  Bank account ending in 9439:

17          (1)   A total of approximately $83,000 to Unknown Debit

18  Transactions between April 2006 and January 2007.

19          (2)   A total of approximately $50,693 to Miracle on April 28,

20  2006.

21          (3)   A total of approximately $22,014 to the Internal Revenue

22  Service on February 23, 2006.

23          e.    approximately $24,500 was disbursed from Basilam's Columbia

24  Bank account ending in 5252:

25          (1)   A total of approximately $17,126 Unidentified Items between

26  March 2006 and January 2007.

27          (2)   A total of approximately $4,371 to Miracle between

28  November 2006 and January 2007.

1          (3).    A total of approximately $3,003 to miscellaneous charges

2   between March 2006 and January 2007.

3          f.      approximately $1,080,656 was disbursed from Miracle's personal

4   accounts located at Columbia Bank ending in 8221, 4662, 8213, and 4399 for Miracle's

5   personal benefit. As noted above, a total of $1,830,000 of investor funds were deposited

6   directly into these accounts between September 2004 and February 2007. The difference

7   of approximately $749,344 of investor funds deposited to these accounts was either paid

8   back to investors or transferred to accounts belonging to Laramie, MCube, Diski LLC,

9   Basilam LLC, or Hal-Rem LLC.

10      59.    Although I have not yet completed an analysis of these bank accounts for

11  the period since February 2007, my preliminary review of the records of the accounts for

12  this period suggests a similar pattern and similar activity regarding the manner in which

13  investor monies have been deposited, transferred between accounts, and disbursed.

14      60.    I have not been able to conduct a similar comprehensive analysis of foreign

15  bank accounts because I do not have relevant records. During the course of DFI's

16  investigation, MCube did produce records for PT MCube Indonesia's account at Bank

17  Niaga ending 1000 for the four months from January 2006 until April 2006 (except for

18  pages 1 and 2 of the March 2006 statement which were missing). According to these

19  statements:

20          a.      approximately $7,610,987 was deposited into the account:

21              (1)     $6,780,052 was deposited into the account from Pertamina.

22              (2)     $830,935 was deposited from unidentified sources.

23          b.      $6,515,353 was disbursed from the account:

24              (1)     $3,325,000 was paid to El Nusa Drilling.

25              (2)     $2,718,812 was paid to Pemindahdukuan.

26              (3)     $471,541 was paid to unidentified sources.

27      61.    More recently, in September 2007, Agent Moran received from the CS

28  copies of records for the same PT MCube Indonesia account at Bank Niaga account

1  ending in 1000 for the period between September 2005 and June 2007.  According to the
2  CS, the CS recently had received the records from Cole, who, in turn, had obtained them
3  from another person who was an investor in MCube and its related companies.

4      62.  The records received from the CS are inconsistent with the statements
5  previously produced by MCube to DFI in various respects.  First, the statements received
6  from the CS did not have any of the $6,780,052 of deposits from Pertamina.  Second, the
7  statements received from the CS did not have any of the $3,325,000 of payments to
8  Elnusa Drilling.  Third, a careful analysis of the statements revealed multiple formatting
9  and text errors on the statements provided to DFI.  These included errors in font size,
10  spacing, and account numbers.  For instance, page 1 of the April statement provided to
11  DFI lists the account number as 085-02-00211-00-0, while page 2 (incorrectly) lists it as
12  805-02-00211-00-00.  The statements obtained from the CS did not contain similar errors.
13  As noted above in Paragraph 34, I believe that the statements provided by MCube to DFI
14  were altered in an attempt falsely to suggest that MCube was engaged in, and generating
15  revenue from, oil production activities in Indonesia that the company was not actually
16  generating.

17      63.  A review of the PT MCube Indonesia statements for the Bank Niaga
18  account ending in 1000 received from the CS for the period September 2005 and June
19  2007, revealed that no deposits were received from Pertamina and no payments were
20  made to Elnusa Drilling.  It revealed two outgoing wires to the United States for a total
21  of approximately $1,015,040, dated June 26, 2007.  One wire for $450,000 went to
22  MCube's Washington Mutual Bank account ending in 7456 and the second wire for
23  $565,000 went to Miracle's Washington Mutual Bank account ending in 9960.  The
24  majority of deposits to the PT MCube Indonesia account appear to come from MCube
25  accounts in the United States.  The majority of disbursements are wires and transfers to
26  unidentified sources.

27      64.  The CS also provided copies of statements for a PT MCube Indonesia
28  account at Bank of America account in Indonesia ending in 6025 for the period from

1  January 2007 and July 2007. Those records revealed the following:

2         a.      the majority of deposits to this account appear to be wires from

3  MCube and Laramie accounts out of the United States.

4         b.      the majority of disbursements are wires and transfers to other PT

5  MCube Indonesia accounts and unidentified sources.

6         c.      there are no outgoing wires to Miracle's companies or personal

7  accounts within the United States.

8         d.      there are no deposits from Pertamina.

9  65.    My analysis suggests that, contrary to representations made to the investors,

10 money from Diski LLC, Basilam LLC, and Hal-Rem LLC investors was not consistently

11 invested in the related oil and gas ventures but commonly was diverted to MCube

12 accounts. Some of the money later was transferred back to the Diski LLC and Basilam

13 LLC accounts to fund payments to investors. Most of the money not transferred back to

14 these accounts was either paid to Laramie or MCube investors, paid Laramie or MCube

15 expenses, or was paid to Miracle. My analysis of all the U.S. bank accounts I have

16 reviewed reveals no incoming wires from Malaysia and only two incoming wires from

17 Indonesia for approximately $1 million dollars. I see no evidence in any of the records I

18 have reviewed that would support the statements made in quarterly updates to investors

19 through 2006 and early 2007 that MCube, Diski, or Basilam earned $42 million during

20 2006.

21 F.     Undercover Investigation

22 66.    Recently, Agent Moran and I utilized an undercover agent ("the UC"). The

23 UC represented that his name was John Hastings and that he was a wealthy individual

24 interested in investing in MCube and/or Hal-Rem LLC. During July and August 2007,

25 the UC had three separate meetings with Miracle, each of which was recorded. During

26 the course of these meetings, Miracle solicited the UC to invest increasingly large

27 amounts in MCube. Miracle also made various representations to the UC concerning

28 MCube and its associated companies.

1      67.    Miracle told the UC that Miracle was the majority shareholder of MCube

2 and that Miracle and Kechik had built the company. Miracle told the UC that the UC was

3 the last individual investor whom MCube would accept, and that, in the future, MCube

4 would limit itself to institutional investors. Miracle said that MCube was willing to deal

5 with the UC because it needed his funds "to bridge to the big money coming a month

6 from now." Miracle began by soliciting an investment of "seven figures" and gradually

7 increased this to $15 million.

8      68.    Miracle told the UC that MCube planned to offer recission to Hal-Rem

9 LLC investors, that MCube's attorneys speak with DFI every two to three weeks

10 concerning the subject, and that DFI was satisifed with MCube. I know from speaking

11 with the attorney at DFI who handled the DFI action that no attorneys representing

12 MCube have contaced DFI since the conclusion of DFI's enforcement action in April

13 2007.

14      69.    Miracle told the UC that "every penny" that the UC invested would be put

15 into Halmahera and Rembang, that MCube's accounting was "perfect" and that

16 "everything that was supposed to be used for certain things, has been used for certain

17 things. Halmahera and Rembang is completely isolated." This statement appears to be

18 inconsistent with company statements, witness interviews, and my financial analysis, all

19 of which suggest that Hal-Rem investors' money has been used to pay dividends to earlier

20 investors.

21      70.    Finally, the UC asked Miracle whether Miracle had any felony convictions.

22 Miracle told the UC that he did not. The UC asked whether Miracle ever had been

23 arrested, and Miracle responded that he had been arrested for drunk driving and had

24 learned his lesson. Miracle's statements are inconsistent with his criminal record, which

25 includes both an arrest and a subsequent conviction for first degree theft.

26 G.    Miracle's Taxes

27      71.    On his Form 1040 for the 2004 tax year, Miracle reported wages of

28 $25,000, interest of $10, a capital loss of $3,000, and an IRA distribution of $6,200, for

total income of $28,210. A search of the IRS' internal database indicates that, to date, Miracle has not filed tax returns for tax years 2005 and 2006. For tax years 2005 and 2006, married persons who made incomes of $16,700 and $16,900, respectively, were required to file a tax return.

72.    A preliminary review of Miracle's personal bank accounts at Columbia Bank, for tax August through December of 2004, for 2005, and for 2006 revealed approximate total of deposits as follows:

| Year | Total Deposits |
|------|----------------|
| 2004 | $   264,472 |
| 2005 | $   891,819 |
| 2006 | $1,272,034 |

73.    Based on these deposits, Miracle's tax return for tax year 2004 appears to understate Miracle's income. Moreover, my investigation suggests, that, in addition to his accounts at Columbia Bank, Miracle also had an account at US Bank during 2004. I have subpoenaed US Bank but am still waiting to receive records for this account. If Miracle had an account at US Bank, his 2004 bank deposits likely would be even higher, and his 2004 tax return even more inaccurate. Miracle's personal bank accounts for 2005 and 2006 show deposits that greatly exceed the income filing requirement for those years. Moreover, Miracle's testimony during his DFI deposition that he was earning a total salary of $680,000 suggests that he clearly had an obligation to file tax returns for those years.

IV.    LOCATIONS TO BE SEARCHED

74.    As noted above, I make this affidavit to search four locations:

a.    The offices of Laramie Petroleum, Inc., located at Two Union Square, 601 Union Street, Suite 4620, Seattle, Washington 98101;

b.    The offices of MCube Petroleum, Inc, located at Two Union Square, 601 Union Street, Suite 4610, Seattle, Washington 98101;

c.    Miracle's residence, located at 9312 Northeast 32nd Street, Clyde

1  Hill, Washington 98004; and

2        d.    Cole's residence located at 2205 219th Lane Southeast, Sammamish,
3  Washington 98075.

4        75.    I believe that these addresses are correct, because Miracle stated in his DFI
5  deposition that Laramie's and MCube's and offices are located at 601 Union Street,
6  Suites 4610 and 4620, Seattle, Washington 98101. I have gone to these addresses and
7  independently confirmed that the Laramie and MCube offices are located at 601 Union
8  Street, Suites 4610 and 4620, Seattle, Washington, respectively. Both suites are located
9  on the 46th floor of 601 Union Square. The name Laramie Petroleum appears on a large
10 wood sign to the left of the entrance to Suite 4620. The name MCube Petroleum appears
11 on the glass to the left and right of the main entrance to Suite 4610.

12       76.    Miracle also stated in his DFI deposition that he lived at 9312 Northeast
13 32nd Street, Clyde Hill, Washington. The house is a two-story single-family residence
14 with an attached four car garage on a half-acre lot. The exterior appears to be of wood
15 construction, brick, brown in color with beige trim and a composition roof. There is a
16 decorative fountain in the driveway of the house. The number "9312" is affixed to the
17 trim on the left side of the garage door closest to the front door.

18       77.    A search that I conducted of public records shows Peter T. Cole and Bonnie
19 B. Cole are the owner of a property located at 2205 219th Lane Southeast, Sammamish,
20 Washington 98075. According to a list of MCube investors, dated September 2007,
21 Cole's address as 2205 SE 219th Lane, Sammamish, Washington. The house is a two-
22 story single-family residence, with a a composite roof and blue-gray siding above a brick
23 base. The number 2205 is affixed to the right of the garage.

24       78.    I believe that there will be evidence of Miracle's crimes at Laramie's and
25 MCube's offices, because I know from interviews that there are a number of employees
26 who work at each office and because I know from this investigation that Miracle and
27 others have generated large volumes of documents relating to Laramie, MCube, Diski
28 LLC, Basilam LLC, and Hal-Rem LLC. In addition, I know, based on my training and

1  experience, that it is common for individuals engaged in business enterprises involved in

2  fraudulent activity, including wire fraud, mail fraud, money laundering, conspiracy, and

3  tax violations, to maintain records of their fraudulent activities at their offices.

4        79.    I believe there will be evidence of Miracle's crimes at his home, because

5  the Laramie Employee told me that Miracle commonly takes his computer when he leaves

6  the office and takes a briefcase home with him every night.  In addition, the CS has told

7  Agent Moran that Miracle regularly takes files and checks home.  Finally, I know, based

8  on my training and experience it is common for individuals engaged in business

9  enterprises involved in fraudulent activity, and, in particular, individuals who are

10  committing fraud relating to their personal taxes, to maintain records such as receipts,

11  bank records, and other financial documents relating to their fraudulent activities at their

12  personal residence.

13        80.    I believe there will be evidence at Cole's home for several reasons.  First,

14  Cole owns shares of Laramie and MCube and units in Diski LLC, and remains involved

15  in MCube's affairs.  As an owner/investor, he presumably receives letters and/or e-mails

16  from MCube and its associated entities.  Second, Cole remains actively involved in

17  MCube's affairs.  He organized a July 21, 2007, "informational meeting" of MCube

18  investors "to allow investors a forum to openly discuss the status of the company," and

19  sent e-mail invitations to investors for this meeting.  I presume that Cole has documents

20  relating to this meeting, or that he received in connection with the meeting, including e-

21  mails received from other investors in the wake of Cole's invitation.  Third, in September

22  2007, Cole gave the CS copies of statements for PT MCube Indonesia accounts at Bank

23  Niaga and Bank of America, as well as copies of MCube's articles of incorporation,

24  bylaws, and minutes of shareholder meetings.  I believe it is likely Cole kept a copy of

25  any records that he provided to the CS for himself, and that Cole probably has other

26  records relating to MCube and its affiliates that he did not give to the CS.  I believe Cole -

27  - who no longer has an office at MCube -- would keep all of these records at his home.

28        V.   COMPUTERS AND OTHER ELECTRONIC MEDIA

81. Based on documents obtained and interviews conducted during my investigation, I believe Miracle has used, and continues to use, computers in connection with his fraudulent scheme. To take but one example, investors regularly received e-mailed memos and spreadsheets from MCube employees relating to MCube. In addition, it has been my experience that it is common for individuals involved in sophisticated fraudulent activity, including wire fraud, mail fraud, money laundering, conspiracy, and tax violations, to use computers or other electronic storage media to store records. As a result, it is my belief that any number of the items sought in this affidavit may be found stored electronically. Based on my experience and my consultation with Special Agent William Freeland, Computer Investigative Specialist, who has approximately four years of specialized training and experience in searching for electronic evidence, I also know that electronic evidence can be moved easily from one computer or electronic storage medium to another. As a result, I believe that electronic evidence may be stored on any computer or electronic storage medium present at the search sites.

82. In addition, based on my training and experience and that of Special Agent William Freeland, I know that in most cases it is impossible successfully to conduct a complete, accurate, and reliable search for electronic evidence stored on a computer or other electronic storage media during the physical search of a search site. This is true for a number of reasons, including but not limited to the following:

a. *Technical Requirements: Searching computers and other electronic storage media for criminal evidence is a highly technical process requiring specific expertise and a properly controlled environment.* The vast array of computer hardware and software available requires even computer experts to specialize in particular systems and applications, so it is difficult to know before a search which expert is qualified to analyze the particular system(s) and electronic evidence found at a search site. As a result, it is impossible to bring to the search site all of the necessary personnel, technical manuals, and specialized equipment to conduct a thorough search of every possible

1   computer system. In addition, electronic evidence search protocols are exacting scientific

2   procedures designed to protect the integrity of the evidence and to recover even hidden,

3   erased, compressed, password-protected, or encrypted files. Since computer evidence is

4   extremely vulnerable to inadvertent or intentional modification or destruction (both from

5   external sources or from destructive code embedded in the system such as a "booby

6   trap"), a controlled environment is essential to ensure its complete and accurate analysis.

7            b.       Volume of Evidence: The volume of data stored on many computers

8   and other electronic storage media is typically so large that it is impossible to search for

9   criminal evidence in a reasonable period of time during the execution of the physical

10  search of a search site. A single megabyte of storage space is the equivalent of 500

11  double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is

12  the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing

13  fifteen gigabytes of data are now commonplace in desktop computers. Consequently,

14  each non-networked, desktop computer found during a search can easily contain the

15  equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x

16  12' x 10' room to the ceiling.

17           c.       Hidden or Obfuscated Evidence. Computer users can conceal data

18  within computers and electronic storage media through a number of methods, including

19  the use of innocuous or misleading filenames and extensions. For example, files with the

20  extension ".jpg" often are image files; however, a user can easily change the extension to

21  ".txt" to conceal the image and make it appear as though the file contains text. Similarly,

22  computer users can encode communications to avoid using key words that would be

23  consistent with the criminal activity. Computer users can also attempt to conceal

24  electronic evidence by using encryption technologies. For example, some encryption

25  systems require that a password or device, such as a "dongle" or "keycard," be used to

26  obtain a readable form of the data. In addition, computer users can conceal electronic

27  evidence within another seemingly unrelated and innocuous file using a process known as

28  "steganography." For example, by using steganography, a computer user can conceal text

1   in an image file in such a way that it cannot be read when the image file is opened using

2   ordinary means. As a result, law enforcement personnel may have to search all the stored

3   data to determine which particular files contain items that may be seized pursuant to the

4   warrant. This sorting process can take a substantial amount of time, depending on the

5   volume of data stored and other factors.

6          d.      Deleted or Downloaded Files. Computers and other electronic

7   storage media allow suspects to delete files to attempt to evade detection or to take other

8   steps designed to frustrate law enforcement searches for information. However,

9   searching authorities can recover computer files or remnants of such files months or even

10  years after they have been downloaded onto a hard drive, deleted, or viewed via the

11  Internet. When a person "deletes" a file on a home computer, the data contained in the

12  file do not actually disappear; rather, the data remain on the hard drive until they are

13  overwritten by new data. As a result, deleted files, or remnants of deleted files, may

14  reside in free or "slack" space (i.e., in space on the hard drive that is not allocated to an

15  active file or that is unused after a file has been allocated to a set block of storage space)

16  for long periods of time before they are overwritten. A computer's operating system may

17  also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have

18  been viewed via the Internet are automatically downloaded into a temporary Internet

19  directory or "cache." The browser typically maintains a fixed amount of hard drive space

20  devoted to these files, and the files are only overwritten as they are replaced with more

21  recently viewed Internet pages. Thus, the ability to retrieve the residue of an electronic

22  file from a hard drive depends less on when the file was downloaded or viewed than on a

23  particular user's operating system, storage capacity, and computer habits.

24          e.      Search Techniques. Because of the above-described technical

25  requirements, volume of evidence, and the ability of suspects to delete, download, hide

26  and/or obfuscate evidence, the analysis of electronically stored data may entail any or all

27  of several different computer forensics techniques. Such techniques may include, but are

28  not limited to, surveying various file "directories" and the individual files they contain

1   (analogous to looking at the outside of a file cabinet for the pertinent files in order to

2   locate the evidence and instrumentalities authorized for seizure by the warrant);

3   "opening" or reading the first few "pages" of such files in order to determine their precise

4   contents; "scanning" storage areas to discover and possibly recover recently deleted data;

5   scanning storage areas for deliberately hidden files; and performing electronic "keyword"

6   searches through all electronic storage areas to determine whether occurrences of

7   language contained in such storage areas exist that are related to the subject matter of the

8   investigation.

9       83.   In accordance with the information in this affidavit, law enforcement

10   personnel will execute the search of computers systems seized pursuant to this warrant as

11   follows:

12       a.   Upon securing the search sites, law enforcement personnel trained in

13   searching and seizing computer data will make an initial review of any computer

14   equipment and storage devices to determine whether these items can be searched on-site

15   in a reasonable amount of time and without jeopardizing the ability to preserve the data.

16       b.   If the computer equipment and storage devices cannot be searched

17   on-site in a reasonable amount of time, then the law enforcement personnel will

18   determine whether it is practical to copy the data during the execution of the search in a

19   reasonable amount of time without jeopardizing the ability to preserve the data.

20       c.   If the law enforcement personnel determine it is not practical to

21   perform an on-site search or make an on-site copy of the data within a reasonable amount

22   of time, then the computer equipment and storage devices will be seized and transported

23   to an appropriate law enforcement laboratory for review. The computer equipment and

24   storage devices will be reviewed by appropriately trained personnel in order to extract and

25   seize any data that falls within the list of items to be seized set forth herein, and also to

26   determine whether, and to what extent any computer hardware or software, or any data

27   electronically stored is an instrumentality of the offense.

28       d.   In order to search fully for the items identified in the warrant, the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

computer personnel may examine all of the data contained in the computer systems to view their precise contents and determine whether the data fall within the list of items to be seized pursuant to the warrant.  In addition, the computer personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data fall within the list of items to be seized pursuant to the warrant.

84.     If searching authorities determine that none of the data contained on a computer system fall within any of the items to be seized pursuant to the warrant, law enforcement personnel will return the computer system within a reasonable period of time, unless further authorization is obtained from the Court.

85.     In order to search for data that fall within the list of items to be seized pursuant to the warrant, law enforcement personnel will seize and search the following items (heretofore and hereinafter referred to as "computer systems"), subject to the procedures set forth above:

a.     Any computer equipment and storage device capable of being used to commit, further, or store evidence of the offense listed above;

b.     Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.     Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.     Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1            f.      Any physical keys, encryption devices, dongles and similar physical

2   items that are necessary to gain access to the computer equipment, storage devices or

3   data; and

4            g.      Any passwords, password files, test keys, encryption codes or other

5   information necessary to access the computer equipment, storage devices or data.

6                 VI.   PRIVILEGED INFORMATION

7       86.     I know from the investigation that an attorney, George Atwater, previously

8   was associated with Miracle, and some or all of Laramie, MCube, Diski LLC, Basilam

9   LLC, and Hal-Rem LLC. Atwater apparently was the Secretary of both Laramie and

10   MCube. Atwater apparently also functioned as in-house counsel for these companies. I

11   also know that MCube issued a press release announcing that it had retained the law firm

12   of Perkins Coie LLC. And I know that an attorney, Shannon McDougald, represented

13   MCube in connection with DFI's investigation.

14       87.     As a result, to avoid reviewing privileged materials, searching agents will

15   use the following procedures. Agents Moran and I will not participate in the search and

16   will not serve as seizing agents at any location. Agents conducting the search will be told

17   that any documents to or from any of Atwater, Perkins Coie, or Shannon McDougald (as

18   well as any other documents the agents believe may be privileged) that are seized should

19   be segregated from other documents. These documents subsequently will be reviewed by

20   an Assistant United States Attorney with no involvement in the investigation (the "taint

21   AUSA"). The taint AUSA will release documents that he/she determines are not

22   privileged to Agent Moran or to me, will return documents that he/she determines are

23   privileged to the entities or persons from whom they were seized, and may submit

24   documents as to which he/she is uncertain to the Court for review.

25                VII.   CONCLUSION

26       88.     Based on my experience and the facts set forth in this Affidavit, I believe

27   there is probable cause to believe that Miracle and his associates have committed

28   violations of 18 U.S.C. §§ 371, 1341, 1343, 1956, and 1957, and 26 U.S.C. §§ 7201,

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   7206(1), and 7203, and that at 601 Union Street, Suite 4610, Seattle, Washington; 601

2   Union Street, Suite 4620, Seattle, Washington; 9312 Northeast 32nd Street, Clyde Hill,

3   Washington; and 2205 219th Lane Southeast, Sammamish, Washington 98075 there is

4   evidence, fruits, and instrumentalities of these crimes.

5

6

        JOSEPH C. LOPEZ

7           Special Agent, Criminal Investigation Division
        Internal Revenue Service

8

9   SUBSCRIBED AND SWORN to before me this 24 day of October, 2007.

10

11

        UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28